**UNITED STATES of America,
Plaintiff,**

v.

**Charles HART, William Hart and Amos
Hart, doing business as Hart Brothers
Sawmill, Fort Yates, North Dakota, De-
fendants.**

Civ. No. 614.

United States District Court
D. North Dakota,
Southwestern Division.

Aug. 12, 1965.

Richard V. Boulger, Asst. U. S. Atty.,
Fargo, N. D., for plaintiff.

Robert Vogel, Vogel, Ulmer & Bair,
Mandan, N. D., for defendants.

RONALD N. DAVIES, District Judge.

Pursuant to Public Law 85–915,[1] ap-
proved in furtherance of the Oahe Dam
and Reservoir Project, on the Missouri
River on September 2, 1958,[2] the United
States condemned certain lands located
in Sioux County, North Dakota, which
belonged to the Standing Rock Sioux
Indian Tribe.

Public Law 85–915 provided, in part,
that;

"Sec. 8. Up to sixty days before the
individual landowners are required
to vacate the land in accordance with
the provisions of this Act, they shall
have the right without charge to cut
and remove all timber from their re-
spective lands and to salvage the im-
provements on their respective lands

[1]. 72 Stat. 1762.

[2]. 58 Stat. 887.

but, if said rights are waived or not exercised within the time limit herein specified, the tribe, through the tribal council, may exercise the rights: *Provided,* that the salvage permitted by this section shall not be construed to be compensation."

On February 25, 1960, the Standing Rock Sioux Indians, acting through their Tribal Council, entered into a contract with Charles and Amos Hart, doing business as Hart Brothers Lumber Company, under which the Hart brothers were to process standing timber on lands previously owned by the tribe. Logs and lumber from the timber were to be utilized in construction of approximately fifteen dwelling houses with the Hart brothers to receive in payment $56.00 per thousand board feet of processed lumber and were to retain any not needed for dwelling construction.

Shortly after execution of this contract, a sawmill was erected on the condemned tribal land and Hart Brothers commenced cutting timber, processing the logs into lumber and building dwellings. Since Public Law 85–915 further provided that all lands in the taking area were to be vacated within two years after the Missouri River was diverted through the tunnels at Oahe Dam, Hart Brothers ceased cutting timber August 3, 1960 [3] the only operations conducted after that date were the milling of logs previously cut and construction of several dwellings. There was insufficient lumber to complete the rehabilitation program of construction of dwellings for members of the tribe, and on October 7, 1960, several delegated representatives of the Tribal Council went to Mobridge, South Dakota, where officials from the Omaha District Office of Corps of Engineers, Omaha, Nebraska, were attending a meeting. The Omaha District Office was in charge of the Oahe Dam and Reservoir Project.

While in Mobridge the council representatives met with Major Edmund R.

Preston.[4] Major Preston could take certain leasing action concerning government lands involved in the project. After discussing the situation and conceding that it would be a hardship for the Indians if their request was denied, Major Preston gave oral authorization for the taking of more timber and at least one witness quoted the Major as stating that, "The Corps will be looking the other way." Major Preston believed he had the power and authority to do what he did but was not familiar with any particular statute or regulation that required formal authorization of a lease.

Thereafter the chairman of the Tribal Council told Charles Hart of the Mobridge meeting and authorized the Hart brothers to continue operations under the contract previously executed. On February 12, 1961, Harts again commenced cutting timber, processing logs and using such of the lumber as was needed to complete the construction of dwellings contemplated by the Standing Rock Sioux Tribal Rehabilitation Program.

On May 22, 1963, the Real Property Officer from the Corps of Engineers Omaha District Office informed the Hart brothers that they would have to cease cutting timber and were to remove the sawmill and other personal property from the government land because they were not operating under proper authority. This oral order was not complied with and, thereafter, the Deputy District Engineer for the Omaha District, by letter dated July 19, 1963, directed the Hart brothers to remove all their personal property from government land and enclosed a bill in the amount of $1,911.00 for a "Trespass sale of timber" and further ordered that "Logs and lumber manufactured from logs cut on government land" were not to be removed from the mill site until the bill was paid.

The Hart brothers' attorney replied by letter dated August 9, 1963, stating that a controversy existed which should be settled in court and requested that,

---

3. The Missouri River was diverted through the tunnels at the Oahe Dam on August 3, 1958.

4. At trial time Major Preston had been promoted to Lieutenant-Colonel.

" * * * You either (1) agree that the logs and lumber already manufactured be released to Mr. Hart· upon his deposit, either in court or in a bank to be agreed upon, of the sum of $1,911.00 to abide the outcome of litigation in this matter or (2) you immediately refer this matter to the United States Attorney for the District of North Dakota, with whom we will attempt to make a similar arrangement."

The Hart brothers removed their mill and other personal property from the government land during August 1963, leaving the logs and milled lumber on the site as required by the Deputy Director's order. Periodic inspections revealed to the Harts that lumber was being removed from the site by unknown persons and so they removed the remainder to their lumber yard in February, 1964.

On February 6, 1964, the United States commenced this action to recover the value of the timber cut, on the theory that the defendants had trespassed on government land without lawful authority. The defendants answered and interposed a counterclaim for the value of the lumber that had disappeared from the mill site between the time they ceased operations and the removal of the remainder to their lumber yard. Both parties later amended their pleadings but the gist of the action and counterclaim remained the same. The plaintiff moved to strike the counterclaim and the Court reserved a ruling pending the outcome of the trial to a jury of the main cause of action.[5] The jury returned a verdict in favor of the Hart brothers and thus there remains for consideration plaintiff's motion to strike, and if denied, the merits of the counterclaim, since the parties have stipulated that the Court may consider all of the testimony and evidence received during the trial of the government's case, together with depositions taken April 8, 1965.

The defendants initially contended that this Court had jurisdiction pursuant either to the Tucker Act, as amended, 28 U.S.C.A. §§ 1346(a) (2), 1491 or the Federal Tort Claims Act, as amended, 28 U.S.C.A. § 1346(b). The Tucker Act jurisdiction basis has been abandoned by the defendants and they now rely upon the alleged tortious conduct of governmental employees in wrongfully ordering that the finished lumber be left at the mill site and then failing to reasonably protect it pending litigation.

Although there appears to be some question whether the Federal Tort Claims Act allows counterclaims,

"It is desirable to permit a defendant to interpose in the government's action any counter claim arising out of the same circumstances as the government's claim and based on a claim to which the United States has consented to be sued, and to obtain an affirmative relief when warranted, rather than require the claimant to institute a separate and original action."

United States v. Southern Pacific Company, D.C., 210 F.Supp. 760; United States v. Southern California Edison Company, D.C., 229 F.Supp. 268. See United States v. Ameco Electronic Corporation, D.C., 224 F.Supp. 783. The plaintiff's motion to strike defendant's counterclaim must be, and is hereby, denied.

The order issued by the Deputy District Engineer which required that lumber manufactured from trees cut on government land be left at the mill site was obviously for the purpose of securing payment of the bill for the alleged, "Trespass sale of timber." Pending the outcome of the controversy, the plaintiff was obligated to take reasonable precautions to conserve and protect the lumber. The government's failure to do so resulted in some 27,098 board feet of lumber disappearing, which had a reasonable market value of $65.00 per thousand board feet.

5. 28 U.S.C.A. § 2402 provides that any action against the United States under Sec. 1346 shall be tried to the Court without a jury.

The Court finds that Major Preston, acting within the scope of his authority, gave the Tribal Council permission to continue cutting timber on former tribal lands; that the defendants were properly upon the land pursuant to the contract which existed between them and the Tribal Council; that the plaintiff was negligent in failing to conserve and protect the lumber left at the mill site in compliance with the Deputy District Engineer's order; and that the defendants are entitled to compensation for the government's negligence at a rate of $65.00 per thousand board feet for 27,098 board feet of lumber.

It is so ordered.

This memorandum is considered in compliance with rule 52(a) Fed.R.Civ.P.